Margaret Elizabeth CLINE, as surviving wife of Robert Herrick Cline, Deceased, Platt Cline, as Guardian of the Estates of Robert Herrick Cline II and Kelly Michael Cline, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 1070 Pct.

United States District Court
D. Arizona.

Oct. 31, 1967.

Mangum, Christensen & Wall, Flagstaff, for plaintiffs.

Richard C. Gormley, Asst. U. S. Atty., Phoenix, for defendant.

CRAIG, District Judge.

## STATEMENT OF FACTS

Margaret Elizabeth Cline, as surviving wife of Robert Herrick Cline, deceased, and Platt Cline, as guardian of the estates of Robert Herrick Cline II and Kelly Michael Cline, brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1964). They seek damages for the wrongful death of Robert Herrick Cline, who drowned while performing certain services for the Navajo Army Depot, a United States Military installation located in Coconino County, Arizona.

In the latter part of August, 1965, the management of the Navajo Ordnance Depot in Coconino County, Arizona, concluded to eradicate weeds growing in Water Reservoir No. 1 located upon the Depot by the use of certain chemical solutions designed for that purpose. Previous to the decision to use chemicals in the eradication of the weed growth, attempts had been made to control the weeds through the use of a weed-cutter affixed to a raft. The latter operation successfully removed the weeds from the surface to a depth of approximately five feet but it did not eradicate them.

The Depot employed the Magna Corporation of California to apply an Aqualin herbicide for the purpose of eradicating the weed growth. A Mr. Billy Giles, an employee of Magna visited the location with Mr. Robert Patterson, the buildings, grounds and utilities manager at the Depot. A discussion transpired between Giles and Patterson as to the method of application of the chemical. It was concluded that a metal Aqualin tank and a metal nitrogen tank should be loaded upon the float or raft that had been previously employed in the weed-cutting process, for the purpose of transporting the tanks to the point at which the application of the chemical was to take place.

On August 29th or 30th Giles, with one Earl McKissick, the latter being an employee of the Depot in the capacity of water plant operator, loaded the Aqualin tank and the nitrogen tank upon the weed-cutter float and proceeded into the reservoir. After proceeding some distance the tanks slipped and the float capsized. The occupants, Giles and McKissick, and the tanks were precipitated into the water. The tanks sank to the depth of the reservoir, a depth in excess of

twenty feet. Subsequently a plastic bottle was anchored in the vicinity of the point at which the tanks sank as a marker buoy.

Discussions were held between Mr. Patterson, Mr. Giles and associated management personnel at the Depot concerning an appropriate method to recover the tanks from their position on the bottom of the reservoir. It was generally concluded that grappling for the tanks would be unsatisfactory because of certain safety factors and other reasons. Apparently during the conversation the possibility of securing a diver to recover the tanks was suggested. It was the consensus of those participating in the discussion that the appropriate method would be to secure a diver to locate the tanks and to secure some kind of line to them so that they might be raised and returned to the shore.

For some period of years the Sheriff of Coconino County, Mr. Cecil Richardson, has maintained a Search and Rescue Unit, composed of volunteers who aided the Sheriff in his efforts to recover victims of drowning accidents. The Sheriff had acquired scuba divers' equipment consisting of wet-suits, flippers, air tanks, masks, helmets, weight belts and related accessories. The members of the Search and Rescue Unit were volunteers of varying degrees of experience as scuba divers. Among the volunteers of the Sheriff's Search and Rescue Unit was Robert Herrick Cline.

On August 31, 1965, upon reaching the conclusion that the two lost tanks could be recovered through the services of a diver, Mr. Patterson called Mr. Ward C. Olson, the executive assistant to the Commanding Officer of the Depot. Mr. Olson referred Mr. Patterson to Mr. Donald W. Warner, the Provost Marshal and Security Officer at the Depot. Mr. Patterson discussed the matter with Warner. Thereafter Mr. Warner called Sheriff Richardson and was advised by Richardson that his regular diver was not available, but that Mr. Cline might be able to assist. Warner then contacted Cline who, after some discussion, advised Warner that he could undertake the assignment. Warner then reported to Patterson, and undertook no further responsibility in the matter.

Patterson thereafter called Cline and discussed the problem and the proposed recovery of the tanks with him. Cline indicated that he would undertake the assignment for Twenty-five dollars; that he would arrive at approximately 4:00 o'clock that afternoon. Subsequently Cline called Patterson and advised that he could not make the appointment as scheduled, but would be present the following day between 2:00 and 2:30 p.m.

Cline, with one Louis Gonzales, had previously been engaged to do underwater work at the Depot in the repair of an under-water valve at Reservoir No. 1. Gonzales was a plumber and steamfitter, employed at the Depot. Upon the occasion of the valve repair, Gonzales and Cline worked together under water and were both equipped with scuba diving apparatus.

In preparation for the search for the submerged tanks Mr. Patterson had directed employees of the Depot to cooperate in assisting Cline. Pursuant to that direction two rowboats had been lashed together (the rowboats were of different sizes, one considerably larger than the other). This lash-up was to serve as the platform from which the diving operations were to take place. The larger of the two boats was equipped with an outboard motor; the smaller boat had none.

In addition to the platform and motor the Depot had supplied a make-shift anchor and anchor line, a safety line and two vest-type life preservers.

On September 1, 1965, at approximately 2:00 to 2:30 p.m. Cline arrived at the

Reservoir with the diving equipment loaned him by the Sheriff, and accompanied by his wife and two small children.

The two persons selected to accompany the diver, Cline, were Giles and McKissick (the same gentlemen who had lost the tanks in the previous instance). The three embarked in the two boats, intending to anchor at or near the plastic bottle-buoy marking the approximate location of the tanks. When the party arrived at their destination a brisk wind was blowing and the anchor proved inadequate to hold the boats in place. The party returned to the shore and secured additional weight for the make-shift anchor.

The party then returned to the approximate location of the tanks and McKissick anchored the boats downwind from the buoy. Cline thereupon completed equipping himself and thereafter made two shallow semi-circular passes over the general area, resting at the boats at the conclusion of each pass. The wind continued to blow briskly, and the water temperature at that time and place was approximately forty-three degrees.

Cline prepared to make a third and deeper pass over the area, looking for the tanks, and at that time rejected the use of the safety line. Cline thereupon started upon his third pass. Shortly after submerging on the third dive, Cline suddenly surfaced at a point twenty to thirty feet from the boats and called to the occupants that he was in trouble. Shortly thereafter Giles dove into the water (leaving the safety line safely in the boats), and swam to the aid of Cline. McKissick thereupon weighed anchor. The boats drifted with the wind. McKissick started the motor and attempted to maneuver the craft up-wind closer to Cline and Giles. As he approached the two in the water, McKissick cut the motor off and attempted to throw a safety line into the wind toward Cline and Giles. The wind blew the line back toward the boats which were again drifting away.

McKissick again started the motor, and again attempted to move the boats in closer. On the second approach, McKissick threw his own life jacket to the two in the water, again into the wind, and again the wind blew the life jacket back toward the boats which were again drifting away. Giles, by this time, was becoming exhausted holding Cline afloat. In order to save himself Giles released Cline, who thereupon adjusted his mask, inserted his mouth piece and sank. Giles struggled toward the boat and was assisted into it by McKissick. In the meantime there was on the shore a retinue of supervisory personnel, spectators and Mrs. Cline and her two small children. Mrs. Cline urged several people in her vicinity to go to the aid of her husband in the water some fifty or sixty feet from shore. When she received no response to her appeals, Mrs. Cline started in herself. The cries of her children stopped her and she returned to care for them while Mr. Patterson rushed in to assist. Patterson swam out to the general vicinity of the place at which Cline disappeared. He was able to grasp the rope which was trailing from the boats and attempted to reach the spot where Cline sank. The spot was marked by large rolling bubbles ascending to the surface. The boats continued to drift and Patterson became exhausted trying to stay afloat and to hold the rope and apparently to pull the boats toward him. He finally was able to pull himself to the boats, too exhausted to climb in. He was taken to shore by being pulled along adjacent to the boats. The bubbles over Cline continued to ascend in large rolling form.

McKissick then returned with another employee, Bennie Aragon, and both attempted to dive for Cline, without success. The rolling bubbles continued to mark the spot of Cline's descent for approximately fifteen to twenty minutes, and thereafter ceased.

Cline's body was recovered later the same evening, at approximately 7:30 p. m. through grappling and diving oper-

ations. An autopsy was made the following day. Death was attributed to asphyxiation due to drowning.

## STATEMENT OF THE CASE

Upon the foregoing facts, plaintiffs assert:

(1) Cline was a civilian employee of the Navajo Army Ordnance Depot; that certain duties were imposed on the employer, Navajo, to the employee, Cline; that the employer, Navajo, failed in its duties to the employee, Cline; that the failure to perform the duties required of the employer, Navajo, was the proximate cause of the death of the employee, Cline.

(2) If Cline was not an employee, he was an independent contractor; that the contractee, Navajo, reserved unto itself the right to direct the manner of the operation; that having assumed control of the operation, the contractee was negligent in its undertaking; that the negligence of the contractee, Navajo, was the proximate cause of the death of the contractor, Cline.

(3) Regardless of Cline's status as an employee or independent contractor, Navajo undertook, through its agents and employees, the rescue of Cline; that Navajo performed the rescue operation in a negligent manner; that the negligence of Navajo was the proximate cause of Cline's death.

(4) In any event, Navajo had the "last clear chance" to avoid harm to Cline, who was in a position of peril, regardless of any negligence on the part of Cline, and Navajo is therefore liable for Cline's death.

Upon the foregoing facts, defendant asserts:

(1) The action was improperly brought, because the United States, if a private person, would not be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346.

(2) Cline was an independent contractor and Navajo had no duty with respect to his safety; that Cline's death proximately resulted from the failure of Cline to exercise reasonable care for his own safety.

(3) If, in fact, Navajo assumed control of the work of the independent contractor, Cline, and therefore owed a duty to Cline, and was negligent in the performance of that duty, plaintiffs are barred from recovery because of the contributory negligence of Cline which proximately contributed to his death.

## OPINION

(1) The action instituted by plaintiffs was properly brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. (1964). Under the Act, the United States may be held liable for wrongful death caused by the negligence or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment, where the United States, if a private person, would be liable to the claimant under the law of the place where the act or omission occurred. The circumstances out of which the action arose took place at the Navajo Army Ordnance Depot, Coconino County, Arizona. Under Arizona law, an action founded upon negligence must be based upon a showing (1) that defendant has a duty to protect plaintiff from injury; (2) that defendant failed in that duty; and, (3) that the failure proximately caused plaintiff's injury. Roberson et al. v. United States, 382 F.2d 714, 9th Cir., Sept. 15, 1967; Shafer v. Monte Mansfield Motors, 91 Ariz. 331, 372 P.2d 333.

(2) From the evidence adduced at the trial of this cause, consisting of the testimony of witnesses, depositions in evidence and exhibits, it does not appear that there is sufficient evidence of a master-servant relationship to constitute an employer-employee relationship between the Navajo Army Ordnance Depot as employer and Cline as employee.

The employment contemplated only a short duration; there was no agreement for the payment of wages in the ordinary sense; the contemplated duties of Cline were not those ordinarily performed in the business of Navajo; there were not contemplated the usual deductions from pay generally found in an employer-employee relationship; there was not the degree of immediate control retained by Navajo as that usually found in an employer-employee relationship. Scott v. Rhyan, 78 Ariz. 80, 275 P.2d 891; Southwest Lumber Mills, Inc. v. Industrial Comm., 60 Ariz. 199, 134 P.2d 162; Conasauga River Lumber Co. v. Wade, 6 Cir., 221 F.2d 312, Cert. Den., 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827.

(3) In the instant case Cline agreed to perform a certain task of relatively short duration for a fixed fee. It appears from the evidence that Cline's relation with Navajo was that of independent contractor and contractee. As a general rule a contractee is not liable for the negligence of an independent contractor. Kirk v. United States, 9 Cir., 270 F.2d 110; Dixon v. United States, 8 Cir., 296 F.2d 556; Roberson et al. v. United States, supra. An exception to the general rule is where contractee reserves control over the operations to some degree. Under this circumstance the contractee is bound to exercise reasonable care in those areas where control is reserved or assumed. Arizona Binghampton Copper Co. v. Dickson, 22 Ariz. 163, 195 P. 538, 44 A.L.R. 881; Cummings v. Union Quarry & Construction Co., 231 Mo.App. 1224, 87 S.W.2d 1039; Welker v. Kennecott Copper Co., 1 Ariz.App. 395, 403 P.2d 330; Fluor Corp. v. Sykes, 3 Ariz.App. 211, 413 P.2d 270; Restatement of Torts 2nd § 414.

(4) In the instant case Cline secured his scuba diving equipment from Sheriff Richardson of Coconino County, Arizona. There is no evidence in the record to indicate that there was any material defect in the equipment so acquired and used by Cline which proximately caused or contributed to his death. Defendant asserts that Cline was an expert scuba diver. This assertion is not supported by the record. No inquiry was made prior to the employment of Cline as to his experience and qualification. It was apparently assumed by the management personnel at Navajo that, because of Cline's affiliation with the Sheriff's Volunteer Search and Rescue Unit, he was an expert. The assumption was unfounded and untenable. Moreover, the record discloses that Cline, in fact, was not an expert, and was more in the nature of an amateur with some degree of experience. The record discloses that Navajo reserved unto itself, or assumed the control of, the following areas in conducting the operations:

a. The diving platform (the two boats lashed together).

b. The power for moving the boats.

c. The anchor, anchor line and safety line.

d. The life preservers, their nature and quantity.

e. The personnel to man the boats and assist in the operation.

The record discloses few safety regulations at Navajo relating to surface and under-water operations. Lifejackets were required when on the surface, and a safety line was required. Apparently no consideration was given the recommendations of the National Safety Council, although the Ordnance manual in effect at the time provided that publications of the National Safety Council are acceptable as guides in the formulation of safety standards (Plaintiffs' Exhibits No. 11, No. 16). It is also apparent from the record that no cognizance was taken of the United States Navy Diving Manual (Plaintiffs' Exhibit No. 14). It is interesting to note that, with the exception of Patterson and McKissick, everyone at Navajo who had any connection with the procedures was reluctant to accept responsibility for any phase of the opera-

tion. The testimony of McKissick discloses that he was in charge of the two boats; that he had considerable experience with small boats and out-board motors; that he had never attempted to operate a contraption such as the two lashed boats in the instant case. McKissick's testimony also discloses that the boats were difficult to operate and responded in a clumsy fashion. The record discloses that the safety line which had been provided for use in the operation was neither weighted nor knotted so as to be able to throw it with any degree of accuracy. There were no ring buoys provided at all. The record further discloses that neither Giles nor McKissick had any scuba diving experience, nor had they ever before acted as tenders to a diver. Mr. Louis Gonzales, an employee of Navajo had previously assisted Cline in under-water work in relation to a valve repair at Reservoir No. 1. Gonzales had some experience in scuba diving. Gonzales was a plumber and steamfitter. Because Gonzales was not connected with the water plant department, apparently it did not occur to anyone to assign Gonzales as a tender or assistant to Cline. Whatever the reason, it is interesting to observe that the one employee at Navajo who had any knowledge or experience in scuba diving was not present at any time during the operations under consideration, nor do any of the government witnesses indicate where he was or why he was not present. It is asserted that Cline was, himself, negligent in his alleged failure to affix the safety line to his person prior to undertaking the third dive. This assertion is refuted by the testimony of the expert witness Van Zandt to the effect that in diving in murky water, with a weed condition as in the instant case, a life line would be a greater hinderance than a help in performing the operation.

(5) The record discloses that when Cline surfaced, following his third dive, he was in difficulty. Cline called out that he was in trouble. Giles responded by diving into the water and swimming to him. McKissick responded by throwing things and attempting to maneuver the boats. Neither was successful. The parties on shore were aware of the difficulty, but assumed in the first stages of the rescue attempt that the men in the boats would accomplish the rescue. The record is silent on the cause of Cline's difficulty, but the fact of the difficulty was apparent to all. That a duty existed to assist Cline in his difficulty is clear. It is equally clear that reasonable care should be exercised in the performance of that duty. In fact, Cline not only relied upon the equipment furnished by Navajo, but also relied on the personnel supplied by Navajo. Certainly in his position of difficulty he had no one else to rely upon. Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; Kirincich v. Standard Dredging Co., 3 Cir., 112 F.2d 163; United States v. Lawter, 5 Cir., 219 F.2d 559.

(6) Were we to assume, as defendant argues, that Navajo had no duty to Cline in the contractee-contractor relationship, there still existed the obligation of Navajo to perform the rescue attempt with reasonable care, Cline being then in a position of peril. Owl Drug Co. v. Crandall, 52 Ariz. 322, 80 P.2d 952, 120 A.L.R. 1521; Taylor v. Roosevelt Irr. Dist., 72 Ariz. 160, 232 P.2d 107; Indian Towing Co., Inc. v. United States, supra; see also Bochantin v. Inland Waterways Corp., D. C., 96 F.Supp. 234.

Under the circumstances of the instant case, it makes little difference whether liability is founded upon the contractee-independent contractor relationship, the Good Samaritan Doctrine, effective at the time of the accident, or the Last Clear Chance Doctrine, asserted by plaintiff for the reason that liability of the defendant here is established on any one or all three bases.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS

(1) The management personnel of the Navajo Army Ordnance Depot at Coconino County, Arizona sought the services of Robert Herrick Cline to recover two submerged metal tanks at Reservoir No. 1, located upon the premises of the Depot.

(2) For a consideration of Twenty-five Dollars Robert Herrick Cline agreed with the management personnel of the Navajo Depot to perform the services of a scuba diver in the recovery of the two submerged tanks.

(3) The Navajo Depot retained or assumed the direction, control and supervision of the recovery operations.

(4) The Navajo Depot designated the personnel to assist Cline in the operations.

(5) The Navajo Depot supplied the diving platform (two different sized small boats lashed together) to be used in the operations.

(6) The Navajo Depot supplied the equipment to operate the boats and to conduct the operation: the anchor, the safety line, two life jackets and a motor.

(7) The personnel designated to assist Cline, and the supervisory personnel recognized Cline to have been in a position of peril in the water.

(8) The Navajo Depot personnel attempted a rescue of Cline.

(9) Cline provided the scuba diving equipment necessary to the operation which he had secured from the Coconino County Sheriff.

(10) Cline was not an "expert" nor experienced scuba diver.

(11) The supervisory personnel at Navajo Depot made no thorough inquiry as to Cline's qualification as a scuba diver.

(12) Cline drowned in the course of his attempts to locate the two submerged tanks.

(13) Cline was an employee of Hagadone Newspapers, a division of Scripps-Lee Newspaper Publishers, and was in that corporation's executive training program.

(14) Cline had a life expectancy of 42.16 years (Tr. 159).

(15) Cline's average earnings over his life expectancy would be Twenty-four Thousand Dollars ($24,000) per year.

(16) The present value of Six Thousand Dollars ($6,000) per year for 42.16 years equals One Hundred Twenty-one Thousand Six Hundred Eighty-four and 42/100 Dollars ($121,684.42) (Tr. 159).

(17) The present value of Twenty-four Thousand Dollars ($24,000) per year for 42.16 years equals Four Hundred Eighty-six Thousand Seven Hundred Thirty-seven and 68/100 Dollars ($486,737.68).

(18) Twenty per cent for the cost of maintenance of the decedent over the stated period would be Ninety-seven Thousand Three Hundred Forty-seven and 53/100 Dollars ($97,347.53), (Tr. 159).

### CONCLUSIONS OF LAW

(1) Plaintiffs' decedent, Robert Herrick Cline, was an independent contractor, with Navajo Army Ordnance Depot as contractee.

■ (2) Once it had assumed or reserved supervision and control of the operation the contractee, Navajo Army Ordnance Depot owed a duty to the contractor, Cline, to exercise reasonable care in the supervision and control of the work in which Cline was engaged.

(3) The contractee, Navajo Army Ordnance Depot, was negligent in the following particulars:

a. In assuming the contractor was an "expert" or experienced scuba diver without making inquiry as to his experience and expertise.

b. Neither of the two persons assigned to assist Cline in the diving operations were competent tenders for a scuba diver.

c. The diving platform (the two boats lashed together) was neither safe nor adequate.

d. The emergency equipment provided by the contractee (the safety line and life jackets) were inadequate.

e. No ring-buoy, nor weighted nor knotted safety lines were provided by the contractee.

f. The motor provided by contractee was inadequate to properly maneuver the two lashed boats.

g. When the contractor was observed by the personnel, acting in the scope and within the course of their employment, to have been in a position of peril, the personnel assigned to assist the contractor were negligent in undertaking that assistance.

4. In the attempt at rescue, Navajo Army Ordnance Depot was negligent:

a. In failing to properly maneuver the boats to approach the contractor in distress in the water from the windward side.

b. In failing to give adequate assistance to the contractor in distress through the use of a ring-buoy, an adequate safety line or other adequate life saving equipment.

5. The foregoing negligent acts and omissions proximately caused the death of Cline.

6. Cline was not negligent in the conduct of his maneuvers.

7. Cline was not negligent in failing to use the inadequate safety line in diving into murky weed infested waters.

8. If any finding of fact herein involves matters of both fact and law, to the extent that any such finding of fact may be construed more properly as a conclusion of law, the same is hereby adopted and incorporated herein as a conclusion of law.

## JUDGMENT

From the foregoing findings of fact and conclusions of law filed simultaneously herewith, and pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1964),

It is ordered, adjudged and decreed that plaintiffs have and recover from the defendant the sum of Three Hundred Eighty-nine Thousand Three Hundred Ninety and 15/100 Dollars ($389,390.15), together with costs of suit herein.